Butcher *v.* Philadelphia, Appellant.

Argued November 23, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Abraham L. Freedman,* City Solicitor, with him *Jerome J. Shestack,* First Deputy City Solicitor, for appellants.

*Wm. Barclay Lex,* with him *Joseph P. Flanagan, Jr.,* for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, January 12, 1955:

Vital to the proper disposition of this case is the chronology of the events which gave rise to it: November 6, 1951, The City-County Consolidation Amendment to the Constitution was adopted by the electorate. January 7, 1952, The Philadelphia Home Rule Charter became effective. January 7, 1952, Supplemental Emergency Regulation "B" was adopted by the Civil Service Commission. February 4, 1952, Action was instituted in the case of *Carrow v. Philadelphia.* June 24, 1952, this Court handed down its decision in the *Carrow* case (371 Pa. 255, 89 A. 2d 496). July 2, 1952, Addendum to Emergency Regulation "B" was adopted by the Civil Service Commission. July 31, 1952, Action was instituted in the case of *Lennox v. Clark.* January 5, 1953, this Court handed down its decision in the *Lennox* case (372 Pa. 355, 93 A. 2d 834). June 30, 1953. Emergency Regulation "B" (Section 31.1) was adopted by the Civil Service Commission.

The question here involved is whether Emergency Regulation "B" (31.1), of the Civil Service Commission, is valid. It provided that in all offices, departments, boards and commissions which became city offices, departments, boards and commissions by virtue of the City-County Consolidation Amendment adopted November 6, 1951, all employes appointed *on or before July 2, 1952,* should be continued in their respective positions provided that they passed a qualifying test

prescribed by the Personnel Director and approved by the Civil Service Commission.

In the *Carrow* case we held that the employes of the former county offices had become subject upon the adoption of the City-County Consolidation Amendment to the provisions of the Home Rule Charter, and therefore that a former county employe who became a city employe by virtue of the Amendment could not be dismissed without cause until given an opportunity to take and pass the qualifying test prescribed in Section A-104 of the Charter in order to become entitled to the protection of civil service regulations. (That section of the Charter provided that those who might become employes of the City by virtue of amendment of the Constitution and the enactment of any legislation required by such amendment, who were not appointed after civil service test and certification, should be continued in their respective positions provided that within one year after the charter took effect or within one year after any such constitutional amendment and such legislation became effective, they would pass a qualifying test prescribed by the Personnel Director and approved by the Civil Service Commission.) In the *Lennox* case we likewise held that the City-County Consolidation Amendment was self-executing, and that when, therefore, on November 6, 1951, it was adopted by the electorate, all employes of the former county offices automatically became city employes and no legislation was required to implement the Amendment in that regard. It is plain, therefore, that if the law as proclaimed in those cases had been known on November 6, 1951, to *be* the law, it would have been clear at that time that any person thereafter appointed to one of the former county offices could be so appointed only as a city employe, and therefore, as was pointed out in the *Lennox* case, only by taking the competitive ex-

amination required of all city employes for admission into the civil service.

The plaintiff in the present action, acting in the role of a taxpayer, filed a complaint in equity alleging that, in view of those decisions, the Civil Service Commission had no legal power or authority to provide, by its Emergency Regulation "B" (31.1), that persons appointed to former county offices *after November 6, 1951,* should be exempt from taking the competitive examination prescribed for city employes and could retain their positions merely by taking the qualifying test permitted by §A-104 of the Charter to those who were employes of the former county offices on November 6, 1951, when the City-County Consolidation Amendment was adopted. Plaintiff therefore prayed that emergency regulation "B" (31.1) be declared illegal, null and void, and that the City be restrained and enjoined from acting thereunder. The court below granted the injunction prayed for, and the City and the Civil Service Commission appeal. They contend that it would be unjust to give to the decisions in the *Carrow* and *Lennox* cases a retroactive effect that would result in invalidating the appointments of some 387 employes to former county offices made in good faith during the period of uncertainty and confusion immediately following the adoption of the City-County Consolidation Amendment and the effective date of the Home Rule Charter.

Looking backward to November 6, 1951, what was the situation as it then appeared to city officials? In order to provide for the running of the city's business it was necessary, of course, to make appointments of new personnel to both city and former county offices. As to the city offices no question arose because positions there had been, and continued to be, under civil service regulations, but appointments to the county

offices had not been under any civil service law, and if, notwithstanding the adoption of the City-County Consolidation Amendment, the status of the employes in such offices had not been changed in that respect and would not change until there should be legislation to implement the Amendment, appointments could still be made in the county offices without competitive examinations. The big, undecided question therefore was: did the adoption of the Amendment work an automatic transition from the status of county to city employe? The very phraseology of Section A-104 of the Home Rule Charter indicated the doubt that prevailed in regard to that question, inasmuch as it provided that those who would become employes of the City by virtue of amendment of the Constitution and *"the enactment of any legislation required by such amendment"* would be required merely to take a qualifying test within one year after such amendment *"and such legislation"* should become effective. The City Solicitor himself, in a formal opinion, pending the outcome of the *Carrow* case, ruled that the former county offices could proceed on the assumption that they were not subject to the provisions of the Home Rule Charter without further legislation. Under such circumstances the Civil Service Commission, having enacted the Emergency Regulation "B" of January 7, 1952, which authorized the appointing authorities in certain city offices to create new positions and fill them by provisional appointments without the approval of the Personnel Director, promulgated on July 2, 1952, an Addendum to that Regulation which provided that, "because of the need for an immediately effective regulation and because of the disorganization which would ensue in the absence thereof," all appointments made subsequent to November 6, 1951, in the county offices which became city offices by virtue of the City-County Consolidation

Amendment, should be treated as provisional appointments, to continue in effect unless and until vacated by the Personnel Director. This was the first attempt of the Civil Service Commission, in the light of the decision in the *Carrow* case, to apply the civil service regulations to the former county offices, but at the same time it cautiously reserved to the employes so appointed the right to contest the applicability to them of the civil service regulations and to assert the right to be continued in their positions by taking and passing a qualifying test. When, later, the *Lennox* case was decided, the Civil Service Commission became seriously confronted with the problem as to the retroactive effect of that and the *Carrow* decision on the appointments made after November 6, 1951, of personnel who had been employed on the assumption that they were not subject to civil service regulations and who had now been in actual service for a period of more than a year. In order to solve that problem it appeared reasonable to the Civil Service Commission that, in view of the experience thus had by such employes, the requirements of the merit system could justly and properly be met by applying to them the same principle that had been adopted in Section A-104 of the Home Rule Charter, namely, to give to such employes the opportunity of remaining in the service by passing the qualifying test prescribed by the Personnel Director and approved by the Civil Service Commission instead of taking competitive examinations. [1] Accordingly it superseded

---

[1] It is interesting to note that plaintiff's own brief concedes the justice and wisdom of the provision for such a policy. It says: "The qualifying examination provided in Section A-104 of the charter recognizes the hardship and inequity of compelling an employee who has held his job in a county department, and supposedly become proficient therein, to risk the loss of his position by taking a competitive examination, open to any one, and where, in theory

the Addendum to Emergency Regulation "B" by the promulgation of Emergency Regulation "B" (31.1), which applied that principle.

In our opinion the Civil Service Commission had the discretionary power to adopt Emergency Regulation "B" (31.1) in view of the emergency situation created by the then prevailing uncertainty as to the effect of the City-County Consolidation Amendment on the status of the employes of the former county offices. Inasmuch as that uncertainty was largely, if not entirely, dissipated by the decision in the *Carrow* case, the Commission properly took July 2, 1952 (a week after the decision in that case was handed down), as the "cut-off" date for employes in the former county offices to be allowed to enter the service by passing the prescribed qualifying test. Technically, of course, the fiction of the law is that, when a decision is handed down by a court, it proclaims the law not only as thenceforth existing but as it had always existed and as all persons were presumed to have known. However, this principle of the retroactive effect of a judicial decision has frequently been held not to apply to actions previously taken in good faith. In the analagous case of a statute being judicially declared to be unconstitutional it was said by Mr. Chief Justice HUGHES in *Chicot County Drainage District v. Baxter State Bank*, 308 U. S. 371, 374: "The courts below have proceeded on the theory that the Act of Congress, having been

at least, the candidate receiving the highest grade is awarded the position. In the case of Section A-104 of the charter the obvious purpose of the qualifying examination is only to make sure that the employee is qualified to hold his job, and capable of discharging his duties. Most apparently this is an exception to the strict application of civil service principles, and is based on recognition of the service of the employee and the experience gained through the daily performance of his task over a period of time."

found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree. . . . It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." [2] The principle thus stated was followed and applied in the subsequent case of *National Labor Relations Board v. Rockaway News Supply Co., Inc.*, 345 U. S. 71, 77, 78, in *Phipps v. School District of Pittsburgh*, 111 F. 2d 393, and in *J. A. Dougherty's Sons, Inc. v. Commissioner of Internal Revenue*, 121 F. 2d 700.

The decree of the court below is reversed; the parties to pay their respective costs.

---

[2] In a footnote the court cited Field, "The Effect of an Unconstitutional Statute"; 42 Yale Law Journal 779; 45 Yale Law Journal 1533; 48 Harvard Law Review 1271; 25 Virginia Law Review 210. See also Note, 37 Georgetown Law Journal 574.

DISSENTING OPINION BY MR. JUSTICE BELL:

The ordinance in question so obviously and intentionally sabotages the civil service provisions of the City Charter and so palpably and flagrantly violates the language, spirit and intent of the Charter that its validation by a majority of this Court seems incomprehensible.

The City-County Consolidation Amendment to the Constitution, by its terms, became effective on its adoption on November 6, 1951. The Philadelphia Home Rule Charter was adopted on April 17, 1951, to become effective January 7, 1952. Whatever ambiguities may exist in the 100 page magnum opus known as the Charter, the City Solicitor of Philadelphia certainly knew, and the officers of county offices which on November 6, 1951 became city offices, were certainly put on notice that the *language, spirit and intent of the Charter was to provide and prescribe civil service for Philadelphia's* entire municipal government. This so-called civil service, they all knew, prescribed (1) "qualifying" tests for all county employees who held a position in a county office on November 6, 1951, and (2) a real civil service test for *all* persons * who *thereafter* sought employment in the government of Philadelphia, either in a former city office or in a former county office.

The City knew in January 1952 that employees of the former county office of Sheriff claimed to be entitled under the City Charter to the civil service provisions of the Charter.

The City well knew that the Supreme Court decided on June 24, 1952, in *Carrow v. Philadelphia,* 371 Pa. 255, 89 A. 2d 496, that those who were employed on November 6, 1951 in the county offices in Philadelphia, such as the office of Sheriff, came clearly within the

---

* With a few exceptions not here relevant.

Constitutional Amendment and were protected in their jobs by the civil service provisions of the new City Charter; and that such employees could not be discharged for political reasons or for any other reasons except for just cause.* The language prescribing civil service was, according to Chief Justice STERN "so clear that he who runs may read."

The Chief Justice in his opinion said, inter alia (pages 257, 258, 260) : "The solution of the legal problem presented is entirely free from difficulty if the controlling enactments are read with an eye to their plain and unequivocal meaning instead of with a straining after forced constructions and a seeking of ambiguities where none exist.

. . .

". . . the City-County Consolidation Amendment provided that, until the legislature should otherwise provide, all the county officers should continue to perform their duties and those then serving should be allowed to complete their terms, but it will be noted that no provision was made in regard to the continuance in their positions of the employes of county offices. Accordingly that problem was dealt with in the new City Charter under the comprehensive authority granted to the city by the First Class City Home Rule Act. The Charter set up an elaborate civil service system and *enacted* (section 7-301) *that all employes of the city* (with certain exceptions not here pertinent) *should be under civil service.*** . . . The former county employes were to be given the opportunity of maintaining their positions by passing a qualifying test at some time

---

* Margaret Carrow, who had been discharged for political reasons, was ordered reinstated as a telephone operator in the office of the Sheriff with payment of her salary for the entire period of her dismissal.

** Italics throughout, ours.

during the period of a year. If before such opportunity were afforded them they could be discharged by their employer without cause this provision of the section would be . . . wholly meaningless, . . .".

That decision was impliedly but necessarily based upon the fact that the City Charter became effective on January 7, 1952 and (except as limited or restricted by the legislature or by its own provisions) was self-executing. The *Carrow* decision, on June 24, 1952, also made clear as crystal that any person who desired employment in the municipal government after January 7, 1952, either in a former county office or in a former city office, or in any newly created city office, *must first pass a civil service test.* The only doubt which remained on this point was the question of what (officers and) offices were embraced in the words "county offices" and what were excluded for the reason that they were "state" (officers or) offices.

This doubt was resolved in *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834, where the Court held (1) that the Amendment applied to and embraced the officers, and the Charter applied to and embraced the employees in the office of Sheriff, Recorder of Deeds, Coroner, County Commissioners, Clerk of the Courts, Board of Revision of Taxes and the Registration Commission; and (2) that the employees in each of those offices were subject to and governed by the civil service and other provisions of the City Charter. *

The Court also specifically decided that the City-County Consolidation Amendment became effective immediately upon its adoption, viz., on November 6, 1951, and that it was clearly self-executing. Mr. Chief Justice STERN, speaking for the Court, said (pages 364,

---

* The Court further held that the Register of Wills and the Prothonotary and their respective employees were not county officers or offices, and therefore were not included within the Charter.

366, 367, 368, 369) : ". . . Thus the county officers were effectually brought into the structure of the municipal government. And of course, when the county officers became city officers their employes automatically became thereby city employes.[1]

. . .

". . . Its real and designed result was that, when the former county officers became city officers and the former county employes city employes, *they automatically became subject thereby to the laws* then *in effect governing and regulating city officers and employes,* and also, of course, to any such laws as might thereafter become effective: (cf. Davis v. Carbon County, 369 Pa. 322, 330, 85 A. 2d 862, 867).

. . .

". . . Section 7-301 of the Charter provided that *all officers and employes* of the city, all departments, all independent boards and commissions and all departmental boards and commissions *should,* with certain exceptions, *be under civil service. . . .*

"On January 7, 1952, therefore, *all* city officers and employes *became immediately* subject to these provisions of the Charter, except that the former county employes were afforded by section A-104 of the Charter the privilege of taking a qualifying test to satisfy civil service requirements. Of course, any persons em-

---

[1] "Section A-104 of the Home Rule Charter was made applicable by its provisions to those who 'may become employees of the City by virtue of amendment of the Constitution of the Commonwealth of Pennsylvania and the enactment of any legislation required by such amendment.' In holding in the *Carrow* case that the employes of former county offices had become city employes and were entitled to the rights conferred upon them by that section we intended to hold, and in reaching that conclusion necessarily did hold, that the amendment was in this respect self-executing and did not require the enactment of any legislation."

ployed by former county offices *after*[1] the adoption of
the City-County Consolidation Amendment on Novem-
ber 6, 1951, *were, from the very beginning of their em-
ployment,*[1] *city employes,* and as such *became subject,*
when the Charter went into effect on January 7, 1952,
*to all its provisions in reference to city employes,*[1] just
as all other then existing city employes became so sub-
ject.

. . .

"The court below held that the civil service provi-
sions of the Charter were applicable to former county
officers and their employes, . . . In all these respects
we are in accord with its decision. . . ."

The decision in *Lennox v. Clark,* was handed down
on *January 5, 1953.* It was, of course, declaratory
of the law which was (legally) applicable (1) to those
who were employees of county offices on November 6,
1951, and who had thus acquired a tenure of office
subject to being discharged upon failure to pass a quali-
fying test; and (2) to *all* persons* who *thereafter*
sought employment in the City government, whether
in a former city office or in a former county office, or
in any new city office—these, the opinion clearly said,
could be appointed *only after passing a civil service
examination.* The citizens of Philadelphia in their
Charter clearly and beyond any question (so far as
they legally could) had put an end to the spoils sys-
tem and had adopted civil service for all city (includ-
ing former county) employees; and on these civil serv-
ice provisions of the Charter this Court put its seal
of approval!

After January 7, 1952 the former county officers
(most of whom, before election, were ardent advocates

---

[1] Is it possible for language to be clearer?

* With a few exceptions not here relevant.

of the Charter) appointed without any civil service test, 384 new political employees. Far worse, many of these political appointments were made after this Court's decision in *Carrow v. Philadelphia.* If these appointments were intended, as they undoubtedly were, to give these new political employees civil service status they were made in plain, palpable and flagrant violation of the language, spirit and intent of the Charter and of the decisions of this Court!

Moreover, the City Solicitor, who was thoroughly familiar with the *Carrow* and *Lennox* cases, which he ably argued, wrote a letter to the Chairman of the Civil Service Commission dated *June 30, 1953,* in which he stated, inter alia: "It is my opinion that in the present state of your regulations the date of the adoption of the City-County Consolidation Amendment, November 6, 1951, *is the effective date from which all new appointees in the former County offices must take competitive examinations."* No wonder it was asserted that the Advocates of the City Charter have now become Wreckers of the Charter.

The present regulation of the Civil Service Commission dated *July, 1953,* which attempts to give these new political appointees all the rights, privileges and civil service status of those persons who had been employed in county offices on November 6, 1951—flies in the teeth of the clear language of the Charter and makes a mockery of civil service and of the clear, directly pertinent and controlling opinions of this Court in the *Carrow* and *Lennox* cases. The majority opinion in the present case admits, as it must, that this regulation is contrary to the law and to the prior decisions of this Court. I add that it is equally contrary to good morals and good government! Such a flagrant violation of the Charter and of our prior deci-

sions—adopted as it was with full knowledge of our decisions—should not be tolerated.

Both from a legal and moral point of view, the position of the City administration in this case in undermining and nullifying the civil service provisions of the Charter is indefensible. This is not a case where the right of the City administration to employ 384 political appointees during the so-called transition period is challenged or involved; this is not a case where someone is questioning the right of these men to be paid for the work they did during this so-called transition period. This is not a case of protecting the poor or helping the needy. The sole question here involved is whether these recent political appointees are entitled to (so-called) civil service tenure contrary to the clear language of the City Charter and the clear and mandatory language of the Supreme Court of Pennsylvania. In *Carrow v. Philadelphia,* 371 Pa., supra, the Supreme Court, under the leadership of the Chief Justice, decided that under §7-301 of the Charter *"all* employes of the city (with certain exceptions not here pertinent) should be under civil service"; and that any person who desired employment in the City government *after January 7, 1951* must first pass a *civil service* test. Furthermore, in *Lennox v. Clark,* 372 Pa., supra, a majority of the Court, speaking once again through Chief Justice STERN, said, inter alia (page 368) : ". . . Of course, any persons employed by former county offices after the adoption of the City-County Consolidation Amendment on November 6, 1951, *were, from the very beginning of their employment, city employes, and as such became subject,* when the Charter went into effect on January 7, 1952, *to all its provisions in reference to city employes,\** just as all other

---

\* Italics ours.

then existing city employes became so subject. . . . *the civil service provisions* of the Charter [which are the very heart of the City Charter] *were applicable to former county officers and their employes,* \* . . .".

The present position and contention of the city seeking to give permanent (so-called) civil service status to recent political city appointees, in the teeth of the plain language of the City Charter, in the teeth of the clear and controlling prior opinions of this Court in the *Carrow* and *Lennox* cases, and in the teeth of the written opinion of the City Solicitor dated June 30, 1953, is legally and morally indefensible. The City is in the position of the famous California center who picked up a fumble and ran toward the wrong goal. No heat of battle, no specious plea of an emergency or transition period can justify or validate a *subsequent* regulation (adopted long after the *Carrow* and *Lennox* decisions) which sabotages the civil service provisions of the Charter and so clearly and flagrantly violates its language, spirit and intent.

I would affirm the decree of the Court below.

Mr. Justice ALLEN M. STEARNE joins in this dissenting opinion.

---

\* Italics ours.