## Anderson v. School District of Philadelphia

*Marvin Katx, Louis M. Natali,* for plaintiffs.
*Vincent J. Salandra,* for defendants.

CAVANAUGH, J., January 10, 1974.—This case is before us as a class action in mandamus contesting the 1968 action of the Philadelphia Board of Education (hereinafter board) in reducing the central office staff of the School District of Philadelphia (hereinafter school district) by about 20 percent. The individual

plaintiffs herein, who were affected by such a reduction, served in various capacities as administrative, supervisory, or technical central- office personnel. Plaintiffs eventually initiated suit on September 3, 1968, in the form of a complaint in mandamus in three counts: Count I, that the board's action was illegal because of defendants' failure to establish a comprehensive civil service system in violation of section 12.12-308 of the Educational Supplement to the Philadelphia Home Charter of 1965; Count II, that defendants violated the employes' contracts and certain provisions of the Public School Code of March 10, 1949, P. L. 30, 24 PS §1-101, et seq.; and Count III, that defendants' action constituted an arbitrary and discriminatory abuse of power adverse to the public welfare and the interests of plaintiffs for certain enumerated reasons.

In response to the complaint, defendants filed preliminary objections, and, on December 17, 1968, after the submission of extensive briefs and upon oral argument, these preliminary objections were dismissed and defendants directed to answer the complaint within 30 days by order of the Hon. Raymond P. Alexander. On December 31, 1968, the court revoked its order dismissing defendants' preliminary objections and fixed a hearing for January 14, 1969, which was continued at the request of defendants' attorney and rescheduled for March 4, 1969. On April 1, 1969, Judge Alexander sustained his prior order of December 17, 1968; thus, defendants' preliminary objections were dismissed, defendants being directed to file an answer within 20 days of the order. Such answer was filed on April 21, 1969. Finally, after further discovery was undertaken, the case came before this court for a trial on April 17, 1973. At the conclusion of plaintiffs' case, defendants moved for a nonsuit, which motion this

court took under advisement. Furthermore, at the conclusion of their case, defendants moved for a directed verdict, which was also taken under advisement. Both of these motions have been denied by order of this court dated January 10, 1974. At the end of the proceeding, plaintiffs asked for judgment in their favor in the form of reinstatement to their former positions.

## FINDINGS OF FACT

Pursuant to Pennsylvania Rule of Civil Procedure 1038, we make the following findings of fact:

1. In 1968, plaintiffs were employed as administrative, supervisory or technical central office personnel with the school district.

2. In the spring of 1968, the Board of Education of the School District was faced with a severe economic crisis. The board, at a May 13, 1968, meeting stated the problem as follows:

". . . the Board . . . is faced with a possible shortage of thirty-four (34) millions of dollars of revenue with which to finance the 1968-69 Budget. . . . It is necessary in light of this critical situation to take steps to economize on administrative costs of the School District to maximize efficiency of allocation of funds between administrative and other functions of the School District. . . .

"*Resolved,* That the Superintendent be directed to effect a reduction in central office operations of at least three (3) millions of dollars to include a reduction of central office staff by at least twenty percent. . . . That the Superintendent render all due consideration for the legal rights of employees affected by the reduction and established procedures to assist those displaced by the reduction. . . . Each person so affected shall be informed of the following alternatives open to him: retirement, resignation, or application for re-

assignment to a vacant position not eliminated from the 1968-69 Budget."

3. In a "back-up" memorandum to the board entitled "Reduction of Expenditures for Central Office Administrative Personnel," then Superintendent Mark R. Shedd stated that it was:

". . . the unanimous position of the Executive Cabinet and the Superintendent that the reduction of the administrative and secretarial force is an absolutely essential step in the light of the present financial crisis and the increasing requirement of greater managerial economy and efficiency."

In explaining the reduction, Superintendent Shedd said that those positions affected were ones having the least effect on the quality of direct services to the students and in cases where the investment in such services resulting from long-standing personnel practices was out of proportion or balance with the investment in related areas. In sum, "every attempt was made to maintain the efficiency and effectiveness of the system within the constraints of the financial situation."

4. The procedure to be followed in implementing the board resolution, according to the May 13th memorandum was:

"Subsequent to Board action on the positions to be eliminated, the deputy superintendents will invite the incumbents to apply for possible reassignment, retirement and to discuss possible opportunities outside the system.

"Each incumbent's case will be reviewed individually by a committee which will include a deputy superintendent. Those eligible for retirement will be invited to do so. In instances where reassignment is a mutually beneficial decision, the individual will be advised by the personnel office of opportunities. The per-

sonnel office will attempt within its capabilities to aid all those who resign as a result of this reduction to obtain positions elsewhere. This committee may have to effect the separation in instances where such action is deemed advisable by it.

"For those who are aggrieved of the decisions of the special committee concerning the disposition of their case, the Executive Deputy Superintendent will serve as a hearing officer with two others and shall present the facts of the cases and other relevant material to the Executive Cabinet for final administrative review. He shall communicate the decision of the cabinet to the individual and to the special committee for appropriate action.

"A representative of the Legal Office will participate on the special committee to assure the Superintendent that the procedures and actions taken are within applicable laws or regulations."

5. In a statement given the same day, May 13, 1968, Superintendent Shedd further amplified the problem and stated that to meet the crisis:

"[W]e have turned first to those areas of central administration which can be reduced without, we hope, producing a breakdown in the delivery of services to children. . . .

"We have detailed reductions in budgeted levels for central administration of approximately $3.6 million . . . a cutback of at least twenty percent of the central administrative staff. The total cut amounts to 381 positions. . .

"In all cases, our effort has been to preserve intact as much as possible those offices and functions which are of the highest instructional priority and relate most directly to the day to day operations of the school program."

6. By resolution dated May 31, 1968, the board, as

part of the economy program to effect savings in the operating budget, eliminated certain enumerated positions "not among those considered necessary for the operation of the Philadelphia Public School System." Plaintiffs herein were among those holding such positions.

7. To explain in detail the May 13th resolution, Superintendent Shedd formulated a "Rationale Attendant to the Eliminated Positions" on May 31, 1968:

"The intent was to produce the most efficient and economical deployment of anticipated financial resources for the year 1968-69. The effort has been to do so by eliminating only positions which are not essential to maintaining the basic instructional services to children.

"Within the constraints of this priority, the effort was:

"1. To eliminate non-essential positions currently vacant.

"2. To eliminate non-essential positions held by those eligible for retirement.

"3. To reduce positions in programs and activities of low instructional priority to minimum levels required for adequate functioning, while recognizing that 'adequate' in the long run is an insufficient standard.

"4. To eliminate positions which, by virtue of reorganization of central office in the last year, are no longer essential.

"5. To eliminate positions whose functions, through better internal organization of individual offices or divisions, could be adequately performed.

"6. To eliminate positions where possible which became unnecessary through reorganizing for decentralized administration.

"7. Relating closely to the above criteria was [the]

application of a rule of thumb particularly relevant for the position of a supervisor. That is, that in a decentralized system to achieve a balanced allocation of manpower, according to instructional needs, where possible the desired level of supervisors per subject matter should approximate the number of districts."

8. In a May 31, 1968, statement by Board President Richardson Dilworth "On School District's 1968-69 Operating Budget and Current Shortage in Estimated Revenues," the crisis was explained thus:

". . . the Board of Education has adopted an inadequate budget for the fiscal year 1968-69.

"We had originally asked for $34 million in additional revenues, and this was a bare bones request, as it included only two percent of the budget for the improvement of basic education.

"However, extensive attempts to obtain the necessary increase in revenues from either State or City government failed, except for $5 million from the State.

"So we began paring back an already tight budget. First 381 positions were eliminated from the central office budget, to produce a net saving of $3 million."

9. A Reassignment Committee was formed, consisting of Messers. Murray Bookbinder, Richard Gilmore, David Horowitz (Chairman), Russell Leonard, Thomas Rosica and Edward Soken (Legal Counsel). This committee adopted certain "guidelines" to govern its work, as reflected in an August 13, 1968, document:

"1. Individual interviews were held with every person listed for reassignment.

"2. Each interviewed person was given ample opportunity to react to the position offered and to raise any questions.

"3. The Reassignment Committee explored the following options before offering reassignments:

"A. Parallel positions

"B. Closely related jobs

"C. A job opening with similar functions and responsibilities

"D. Another position with a salary loss.

"4. Prompt response was made to all letters either orally or in written form.

"5. Persons who wished to bring legal counsel were permitted to do so.

"6. The policy of 'not bumping' was adopted by the Reassignment Committee i.e., assigning to a position already filled which would result in the necessity to reassign the person presently occupying that position. . .

"7. The Reassignment Committee rejected requests to assign to positions for which certification was held but the individual concerned had never served in the position nor had taken an examination for it.

"8. The most recent tenured position was used as an option for reassignment whenever possible.

"9. No new positions were created.

"10. The right to return to the dropped position within a two-year period was explained as indicated in the May 13 resolution of the Board.

"11. Seniority rights were observed in tenured positions.

"12. Seniority rights were not observed in non-tenured positions.

"13. Persons who took sabbatical leaves were reassigned prior to beginning date of the sabbatical leave.

"14. Persons certified for the Principalship were admitted to examinations despite the fact that the closing date had passed."

"10. Section 12.12-308 of the Educational Supple-

ment to the Philadelphia Home Rule Charter of 1965, 'Personnel Policies,' provides:

"(a) The Board of Education shall establish a table of organization setting forth a roster of positions for each principal administrative unit of the District and shall require the Superintendent of Schools to report monthly any changes made in the table.

"(b) The Board shall adopt regulations based on merit principles and scientific methods governing all incidents of employment, including appointment, promotion, demotion, removal and discipline. . .

"(c) The personnel regulations adopted by the Board shall provide for the preparation, maintenance and revision of a position classification plan and a pay plan for all employes, policies and procedures for recruitment, examinations, promotions, eligible lists and certifications, provisional and emergency appointments, suspension, discharge or reduction in rank, hours of work, holidays, leaves and vacations, employe hearings, and such other matters as may be necessary or proper. Copies of the personnel regulations shall be available for public information and distribution at all times.

"(d) The Board shall in its personnel regulations preserve and safeguard all rights of employment, status, and tenure of all employes of the School District."

## CONCLUSIONS OF LAW AND DISCUSSION

1. *There was an absolute failure of proof by plaintiffs regarding counts II and III of their complaint.*

Plaintiffs alleged in Count II of their complaint in mandamus that defendants violated the employes' contracts and certain provisions of the Public School

Code of March 10, 1949. In Count III, they alleged that the action taken by defendants was an arbitrary and discriminatory abuse of power adverse to the public welfare and the interests of plaintiffs for certain enumerated reasons. However, at trial plaintiffs failed to produce any evidence to support these two counts. All of the averments therein were denied in defendants' answer. Thus, since these averments were at issue and plaintiffs failed to support them by credible evidence, these two counts are deemed by this court to have been abandoned by plaintiffs. There was, thus, an absolute failure by plaintiffs to prove the allegations in these counts. Hence, the conclusions of law and our discussion herein will be based entirely on Count I of their complaint in mandamus.

2. *There was substantial compliance with section 12-308 of the Educational Supplement to the Philadelphia Home Rule Charter of 1965.*

At trial, the sole evidence offered by plaintiffs was the submission into evidence of the May 4, 1971, deposition of Mr. Murray Bookbinder, Executive Director of Personnel for the School District. Their purpose in doing so was to prove that there was no compilation of the rules and regulations governing personnel in the school district in any individual volume or place. It was plaintiffs' position at trial that this failure to compile the personnel regulations in a single place constituted a violation of section 12.12-308 of the Educational Supplement to the Philadelphia Home Rule Charter of 1965. Plaintiffs also offered into evidence the documentation set out in findings of fact, nos. 2-8, supra. Defendants sought to prove that, even though the personnel regulations were not set down in one compilation, there was, in fact, a network of personnel regulations drawn from various sources.

We feel that, although there may not have been exact technical compliance with section 12.12-308, there was substantial compliance therewith. We are, thus, in agreement with defendants on this important issue. The testimony of Mr. Murray Bookbinder was persuasive in this regard. He testified to the effect that the school district had satisfied section 12.12-308 insofar as it had established a table of organization as set forth in the operating budget. He stated that the board had adopted merit principles and scientific methods governing all incidents of employment. The regulations came from various sources: (1) collective bargaining agreements; (2) board bylaws adopted in 1965; (3) various board resolutions concerning personnel practices and policies; (4) administrative bulletins and directives of the Superintendent of Schools; (5) the State Public School Code, including tenure provisions; and (6) personnel practices and procedures developed from the day-to-day business of the school district.

Mr. Bookbinder testified that there was no single compilation of personnel regulations, policies and procedures. In fact, the effect of his testimony was that any effort to so incorporate everything into one volume would be ludicrous, since such a compilation would only be current for about a week or two; in his words, "for as long as it takes to print." When asked whether the personnel regulations and procedures were scientific, Mr. Bookbinder responded that, strictly speaking, no science could be brought to bear on the personnel field; however, he did state that, in his judgment, to the extent that scientific merit principles were achievable, the school district had produced a scientific system of personnel management—rational and impartial, and not arbitrary, as plaintiffs contended.

Thus, the real import of his testimony was that the school district was in compliance with section 12.12-308. We adopt this reasoning.

In support of their position regarding section 12.12-308, plaintiffs cite Carrow v. Philadelphia, 371 Pa. 255 (1952). We feel that Carrow is inapplicable, since plaintiff there, a telephone operator in the sheriff's office, was discharged admittedly without cause. Thus, Carrow is factually distinguishable from the instant case, where positions were abolished. Even the Carrow court recognized this important distinguishing factor:

"[N]othing herein contained must be understood as preventing the dismissal of employes *if the positions they occupy are no longer required, . . . in other words, if by reason of lack of funds or work the force should be reduced"*: 371 Pa. 255 at 262. (Italics supplied in part.)

Furthermore, at trial, plaintiffs argued that their position was analogous to the position of owners of particular properties affected by zoning action not in accordance with a required comprehensive plan; that is, since no comprehensive plan of personnel regulations were developed by defendants, courts, similar to courts faced with ad hoc zoning determinations, will invalidate any ad hoc determinations which are not part of the overall program. We feel that plaintiffs' zoning analogy, interesting though it may be, is not persuasive here. Land use planning and zoning law encompass principles and philosophies different from the field of education and educational administration. In the latter, much free rein *must* be given to school boards which can exercise sound and reasonable discretion in response to a myriad of competing forces, including economic reality, and the deverse needs of a society in a state of constant flux. The school district must of necessity be administered with flexibility and discretion. Such was the case herein.

*3. The procedure formulated and implemented by defendants did not adversely affect plaintiffs' rights.*

The procedure followed by defendants was a reasonable and proper one. It was not the product of a spur-of-the-moment decision nor was it a haphazard procedure, but one which was well planned, organized and implemented by defendants. In fact, the procedure that was utilized contained built-in-safeguards of plaintiffs' rights, and those similarly situated. On behalf of defendants, Mr. David Horowitz, who was the Deputy Superintendent for Instruction in 1968 and is currently Associate Superintendent for School Services, testified as to the reasons for the reductions in the centralized office staff personnel. He made detailed references to the board resolutions, the back-up memorandums by Superintendent Shedd, and the statements by Superintendent Shedd and President Dilworth.*

Mr. Horowitz made particular reference to *the protection of the employes' rights;* witness the May 13th (1968) resolution wherein it is stated:

"Further resolved, that the Superintendent render all due consideration for the legal rights of employees affected by the reduction and establish procedures to assist those displaced by the reduction."

Evidence of this "due consideration for the legal rights of employees," as testified to by Mr. Horowitz, can be seen in the guidelines followed by the Reassignment Committee chaired by Mr. Horowitz. (See finding of fact no. 9.) These guidelines were designed to, and

---

* We do not deem it necessary at this time to discuss these documents in depth as we have already included them in our findings of fact, nos. 2-8, 10. They speak for themselves and convince us, along with defendants' other evidence, that the procedure followed was entirely proper and reasonable.

did, provide a high degree of procedural due process for plaintiffs in arranging their reassignments. Even a cursory reading of the guidelines reveals that this is so. For example, individual interviews were offered; each employe had the opportunity to speak out and react to the positions taken by the committee; the committee did everything possible to examine available options and openings regarding plaintiffs; and plaintiffs had the right to appear with counsel. The sum total of defendants' evidence concerning these guidelines, and the procedure followed, was that they were nondiscriminatory, impartial, rational, not arbitrary, and in conformity with scientific merit principles. We agree.

4. *Defendants had the discretionary right to effectuate the central office staff reduction.*

We feel that defendants had the right to make what they felt to be a necessary reduction in the central staff. It must be remembered that decisions such as were made by defendants here are not made in a vacuum. There are realities, economic and otherwise, to contend with. Such was indeed the case here, where the school district and its leaders were faced with the hard, harsh facts of a likely shortage of millions of dollars of revenue with which to finance the 1968-69 operating budget. To partially alleviate the crisis, the decision was made to reduce central office operations by $3,000,000 through a 20 percent reduction in the size of the staff. Defendants contend, and we agree, that they had the power and authority to make this decision.

The Pennsylvania Supreme Court has dealt with this critical problem in the past. We deem the follow-

ing language from Smith ʻv. Darby School District, 388 Pa. 301 (1957), to be most instructive:

"Over the years our courts have upheld the right of a school board to abolish a position or office and assign the incumbent thereof to a new position or office": 388 Pa. 301 at 310.

The court went on to discuss the following:

"The number and character of departments, positions, offices and teachers necessary in any particular district are matters which lie within the sound discretion of the school board. The school board having exercised its discretion and having organized the departments, positions and offices, it does not follow that all of the positions established become sacrosanct because the board may find, at a later time and as conditions change, that the welfare of the school system requires that a particular department, position or office must be abolished. No position or office or department is indispensable under the school system.

"The power of creation and abolition of departments, positions and offices must rest with the school authorities. The only limitation which should be imposed on the exercise of this power should be that the board must act intelligently, impartially and with sound discretion ever mindful of the high principles enunciated in the Constitution and the Public School Code concerning our educational system": 388 Pa. 301 at 314.

The court then further held:

"It was within the general power and discretion of the appellee school board to determine whether the abolition of the position of Supervising Principal and the creation of the office of Associate Superintendent would tend toward a more efficient administration of the school system": 388 Pa. 301 at 315.

Similar principles were enunciated earlier in Wilson v. Philadelphia School District, 328 Pa. 225 (1937), where the Supreme Court recognized that the salaries of school employes were fixed by law, but "the law does not fix the *number* of such employees. That is left to the *judgment and discretion of the school di-directors"*: 328 Pa. 225 at 235-236. (italics supplied.)

The court stated, and we are inclined to agree, that, generally, the courts are really in no position to exercise control over schools and determine the school administration's policy; "the judges ordinarily are not equipped for this immense task": 328 Pa. 225 at 236. This principle is reaffirmed in Balsbaugh et al. v. Rowland, 447 Pa. 423 (1972).

The principles discussed above are stated another way by the Pennsylvania Commonwealth Court:

"There is no doubt that the Legislature intended the administrators of school districts to have the power to assign its professional employes to particular classes, or to particular schools or positions in accordance with its judgment and discretion reasonably exercised": Abington School Board v. Pittenger, 9 Comm. Ct. 62 (1973).

Defendants herein were faced with a serious crisis brought about by the economic facts of life as they were in 1968. Defendants, in bringing about a reduction in the central office staff personnel, did what they believed they *had* to do, in light of the then existing and blighted operating budget. And, in conformity with the requirements of the law, they did so reasonably, intelligently, impartially and within their sound discretion.

Thus, under all of the law and the evidence, we find for defendants.