The HANOVER SHOE, INC.

v.

UNITED SHOE MACHINERY CORPO-
RATION, Appellant.

The HANOVER SHOE, INC., Appellant,

v.

UNITED SHOE MACHINERY
CORPORATION.

Nos. 15626, 15627.

United States Court of Appeals
Third Circuit.

Argued May 3, 1966.

Decided April 11, 1967.

Rehearing Denied and Supplemental
Opinion Filed May 18, 1967.

Ralph M. Carson, New York City, (Warren, Hill, Henkelman & McMenamin, Scranton, Pa., Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, on the brief), for United Shoe Machinery Corp.

Breck P. McAllister, New York City (Nogi, O'Malley & Harris, Scranton, Pa., Donovan, Leisure, Newton & Irvine, New York City, on the brief), for Hanover Shoe, Inc.

Before FORMAN, GANEY and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

FREEDMAN, Circuit Judge:

This private antitrust action presents a number of important questions.

Plaintiff, The Hanover Shoe, Inc., is a manufacturer of shoes and a customer of defendant, United Shoe Machinery Corporation, a manufacturer and distributor of shoe machinery. In this action brought under § 4 of the Clayton Act (15 U.S.C. § 15) based on violations of § 2 of the Sherman Act (15 U.S.C. § 2) Hanover obtained a trebled damage judgment against United in the amount of $4,239,609, with interest, and an award of $650,000 for counsel fees. United appeals from the judgment on a number of grounds, and Hanover has taken a cross-appeal on the ground that there was not sufficient evidence to support the district court's rejection of one of its large items of damage.

### THE PROCEEDINGS

Almost twenty years ago, on December 15, 1947, the United States brought a civil action against United in the United States District Court for the District of Massachusetts, under § 4 of the Sherman Act (15 U.S.C. § 4) to restrain alleged violations of §§ 1 and 2 of the Act (15 U.S.C. §§ 1, 2). Judge Wyzanski, who heard the case, graphically detailed what he called the "prodigious length" of the trial. "[T]he hearings took 121 days and covered 14,194 pages of transcript and included the offer of 5512 exhibits totalling 26,474 pages (in addition to approximately 150,000 pages of OMR's [records concerning machines in shoe factories as of a certain date] and over 6,000 soft copies of patents) and 47 depositions covering 2122 pages. At the close of the evidence the Court asked for briefs, and requested findings of fact and conclusions of law. The Government offered briefs totalling 653 pages and requests totalling 667 pages. United submitted briefs totalling 1240 pages, and requests totalling 499 pages."[1] On February 18, 1953, Judge Wyzanski filed an elaborate opinion in which he found that United was guilty of monopolization in violation of § 2 of the Sherman Act.

1. United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 299 (D.Mass. 1953), aff'd, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

United States v. United Shoe Machinery Corp., 110 F.Supp. 295 (D.Mass.1953). The Supreme Court affirmed on May 17, 1954 in a per curiam opinion. United Shoe Machinery Corp. v. United States, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

More than a year later, on September 21, 1955, Hanover brought the present treble damage action against United in the United States District Court for the Middle District of Pennsylvania. By pretrial agreement the parties submitted for preliminary decision the defense that any excessive rentals charged to Hanover for shoe machinery would not constitute an injury to its business or property if the excess was passed on to its customers. After the hearing had been held on this issue the district judge died and Chief Judge Biggs designated Circuit Judge Goodrich in his place. Judge Goodrich summarized the complaint as charging that defendant, "as a result of its unlawful control of the market, has caused plaintiff * * * to pay excessive rentals for the lease of shoe machinery." He held as a matter of law that if United was guilty of monopolization and had charged Hanover excessive rentals, Hanover had a cause of action for the difference between what it was charged and what it could properly have been charged in the absence of monopolistic practices. He also held that the injury occurred when Hanover was overcharged for the machinery and that since the cause of action arose at the moment the tort occurred, United would not be relieved of liability because subsequent events might have alleviated some of the ultimate consequences of the wrong, for these would not inure to the benefit of the defendant. Judge Goodrich certified that the case was appropriate for an interlocutory appeal under 28 U.S.C. § 1292(b), because the issue involved a controlling question of law as to which there was substantial ground for difference of opinion, and an immediate appeal might materially advance the ultimate termination of the litigation. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 185 F.Supp. 826 (M.D. Pa.1960). We affirmed in a per curiam opinion in which we rejected the claim that treble damages would result in a windfall to Hanover, stating that Congress had imposed this rigorous penalty and any modification was for it to make and not for the courts. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 281 F.2d 481 (3 Cir. 1960), cert. denied, 364 U.S. 901, 81 S.Ct. 234, 5 L.Ed.2d 194 (1960).

After a subsequent trial without a jury, Chief Judge Sheridan on April 28, 1965 filed a comprehensive opinion holding that Hanover was entitled to recover treble damages for the excess of the leasing costs over what it would have cost to own the same machines had they been available for purchase. Damages were limited to the period beginning July 1, 1939 on the ground that any earlier period was barred by the Pennsylvania statute of limitations, and were awarded to September 21, 1955, the date the action was brought. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 245 F.Supp. 258 (M.D.Pa.1965). Hanover's alternative claim for damages, that the leasing charges were themselves excessive, was rejected by the district court because the Government decree, on which Hanover relied, had made no finding that United's leasing charges were excessive. Hanover has not sought review of this ruling on appeal. On August 12, 1965 Chief Judge Sheridan denied United's motion for a new trial, and entered the judgment from which these appeals are taken.

### ACQUIESCENCE AND DEMAND

At the outset United contends that Hanover acquiesced in its leasing system which helped Hanover to obtain high profits and gave Hanover special benefits such as the right to return obsolete machines and the free services of United's technicians on problems in shoe making. According to United, the absence of a formal demand by Hanover for the sale of United's shoe machinery is fatal to Hanover's claim.

The court below found that "Hanover has proved that as a consequence of United's monopolization it was unable to purchase most of the more important machines which it would have purchased had they been available." 245 F.Supp. at 287. This finding negatives any inference of acquiescence in the United leasing system. The finding in the Government case of the existence of the monopoly and of United's policy against sales, the participation of Mr. Sheppard, Hanover's president, in the effort of a trade association of which he was president to persuade United to offer more of its machinery for sale and Hanover's purchase of machinery from United when it first became possible to do so by virtue of the Government decree, sufficiently support the finding by the court below and forbid our declaring it to be clearly erroneous.

■ The question remains, however, of the necessity of a formal demand for the purchase of machines during the damage period. On this issue the court below found: "Hanover never asked United if it could buy the lease-only machines. Neither did it protest its inability to buy. Mr. Sheppard testified that any such request would have been a 'foolish question.' This explanation does not seem unreasonable in view of the findings in the Government case and the evidence in this case." 245 F. Supp. at 280.

Hanover was, as the court below found, along with the entire shoe machinery industry, a "captive customer" of United. What the witness characterized as foolish amounts to a futile gesture which the law does not require. Hanover had been a customer of United in the leasing of machinery for many years. It was well aware of United's power as the supplier of machinery and of its policy against sales. In such circumstances it would be ironic as well as idle to require the victim of the monopoly to make an explicit demand the denial of which was implicit

in the continuance of the monopoly. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

INJURY

■ 1. United urges that its leasing system did no injury to Hanover because Hanover's competitors were subject to the same practices which United uniformly imposed on all its customers. This is a remarkable proposition. It is founded upon the premise that harm done to a customer loses its injurious effect when similar harm is inflicted upon other customers similarly situated. It would punish a partial wrong but absolve it if it is widespread and thus would reduce the antitrust laws to a moral imperative without realistic effect. There is no reason to relieve actual injury on a basis so unrealistic and undesirable. Keough v. Chicago & Northwestern Railway Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) does not require us to do so. There a shipper sued several railroads for treble damages on the ground that they had by agreement among themselves fixed excessive freight rates. United relies on the statement by Mr. Justice Brandeis that the exaction of the alleged excessive rate, which had been approved by the Interstate Commerce Commission, might not have harmed the plaintiff because all other shippers were entitled to be put on a parity with him. What was involved in *Keough*, however, was a case of "plain repugnancy between the antitrust and regulatory provisions," [2] for the plaintiff was held barred from invoking the original treble damages provision of the Sherman Act because he was limited to the remedy provided by § 8 of the Interstate Commerce Act which conferred a right to untrebled damages where a carrier charged an illegal rate. The statement relied on by United plainly was dictum and was unnecessary to the decision in the case; it is not controlling here. See, e. g.,

2. See United States v. Philadelphia National Bank, 374 U.S. 321, 351, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Pan American

World Airways, Inc. v. United States, 371 U.S. 296, 322, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), Brennan, J., dissenting.

Commonwealth Edison Co. v. Allis-Chalmers Manufacturing Co., 335 F.2d 203, 205–206 (7 Cir. 1964); Atlantic City Electric Co. v. General Electric Co., 226 F.Supp. 59, 65–66 (S.D.N.Y.1964).

■ 2. United also contends that Hanover suffered no injury from United's no-sale policy in the damage period because it could have obtained foreign machinery. The court below found, however, that the foreign machinery which was available was not acceptable to Hanover both because of its inadequate capacity and performance and the lack of available servicing and technical advice. 245 F.Supp. at 285, 286. We cannot say from the record that this finding is clearly erroneous.

■ 3. United claims that Hanover was not legally injured because the leases were lawful and therefore no damage could result from them. The claim of legality of the leases is based on an abstract characterization, torn from the context of United's market control. Judge Wyzanski specifically held that the leases which United employed constituted a means of its monopolization of the industry. Since the leases, although valid as instruments conferring the right of possession on the lessee, were instruments of monopolization, their lawfulness in the abstract does not undo their character as weapons in the consummation of the monopoly. Neither Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947) nor Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959) are of aid to United. They refused to allow a party to a contract to avoid payment thereunder because the underlying contract violated the antitrust laws. This was because the antitrust laws do not provide such a remedy: "The Act prescribes sanctions, and it does not make uncollectibility of the purchase price one of them." Bruce's Juices, Inc. v. American Can Co., supra at 750, 67 S.Ct. at 1018. The court expressly recognized, however, that the appropriate remedy for injury resulting from a violation of the antitrust laws was a treble damage suit. What was said in those cases regarding contracts which are intrinsically or inherently illegal related merely to the right to avoid payment thereunder and not to the remedy available for violation of the antitrust laws.[3]

4. United also claims that Hanover passed on to its customers the difference between what it paid to United in rentals and what it would have cost it to purchase the machines. The validity of a passing-on defense in this case was decided by Judge Goodrich in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 185 F.Supp. 826 (M.D.Pa.1960), aff'd, 281 F.2d 481 (3 Cir. 1960), cert. denied, 364 U.S. 901, 81 S.Ct. 234, 5 L.Ed. 2d 194 (1960). United seeks to distinguish the effect of the decision because it was based on the assumption that the damage claim was for excessive rental charges, whereas the judgment below is based on the difference between the rentals charged and the reasonable cost of the machinery if Hanover had purchased it.

■■ Even if we assume that Judge Goodrich's determination of the passing-on issue is not binding here, his reasoning, which we accept, extends equally to the present claim. As we have seen, he pointed out that the antitrust laws deal with a plaintiff at the moment of injury and do not look to subsequent events which may have reduced the impact of the wrongful conduct. The fact that Hanover might have recouped some of that damage later by increasing the prices of its shoes is irrelevant to the question of damage. We may, indeed, add that if United's claim were accepted it would be difficult to apply the antitrust laws in a prosperous industry,

3. Turner Glass Corp. v. Hartford-Empire Co., 173 F.2d 49 (7 Cir. 1949) was a special antitrust case involving patents in which plaintiff conceded that it would not be entitled to recover unless the agreements were inherently illegal. In any event, to the extent that it would support United's claim that the leases must be inherently illegal to support an antitrust action for damages, we decline to follow it.

where damages would readily be passed on to the consuming public. It would be contrary to the far-reaching social and economic purposes of the antitrust laws to afford release from their obligations to an economic wrongdoer because his victim in self-defense sought recoupment for the injury from the consuming public.

Our decision in Freedman v. Philadelphia Terminals Auction Co., 301 F.2d 830 (3 Cir. 1962), cert. denied, 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67 (1962), does not impair our rejection of passing-on as a defense by a violator of the antitrust law. There fruit brokers brought a treble damage suit for violation of the Robinson-Patman Act resulting from an improper terminal charge. The brokers had purchased the fruit at the defendant's auction on behalf of regular clients and the jury made a special finding that plaintiffs suffered no injury because they received a separate commission for their services, and their clients paid all the charges, including the terminal charges. In upholding the passing-on defense we specifically distinguished the case from the present one. Judge Kalodner, speaking for the Court, said: "Hanover affords no nourishment to plaintiffs' contention with respect to it. There the District Court in granting relief to the plaintiff premised its action on its fact-finding that plaintiff was a *consumer* and not a *middleman* and implicit in that distinction is its subscription to the doctrine enunciated in earlier cases that middlemen cannot recover damages where they suffer no injury by reason of their payment of proscribed charges." (301 F.2d p. 833). Moreover, the question of multiple liability is fundamental in determining whether the passing-on defense shall have validity. See Commonwealth Edison Co. v. Allis-Chalmers Manufacturing Co., 335 F.2d 203, 208–209 (7th Cir. 1964); Atlantic City Electric Co. v. General Electric Co., 226 F.Supp. 59, 71 (S.D.N.Y.1964). This explains the difference between the present case and *Freedman*. There it was the clients of the brokers who had the direct injury which would support treble damage claims against the auctioneer. Here, however, the injury to the customers who purchased the shoes which Hanover made with the machinery it acquired from United is too remote and its force too fragmentized and diluted to support a claim by the individual customers of Hanover.[4]

## REMOTENESS OF INJURY

■■ What has been said regarding the passing-on defense supplies in part the answer to United's contention that any damage that Hanover suffered is too remote and indirect to support a cause of action under § 4 of the Clayton Act, which requires not only injury, but also a causal relationship between the antitrust violation and the injury.[5] The court below found that "Hanover's injury flows proximately from the monopolization," and that by the leases United extracted "large sums of money in excess of the reasonable value of machinery and of the service rendered by United." 245 F.Supp. at 274. In this respect the case resembles Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906), where it was held that injury was sufficiently demonstrated by the City's payment of more than the reasonable price of the defendant's pipes because of defendant's price fixing.[6] Here,

4. Wolfe v. National Lead Co., 225 F.2d 427 (9 Cir. 1955), cert. denied, 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955), which United urges upon us, was specifically rejected by Judge Goodrich (185 F.Supp. at 831) whose opinion we affirmed.

5. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

6. See also, State of Georgia v. Evans, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942).

as in that case, the cost to the customer of doing business was increased as a result of the monopolist's conduct. The consequences of the injury therefore were direct and the cause of action under the narrowest construction of § 4 [7] was made out. In the context of the relation of machinery monopolist and customer manufacturer no more direct injury could be inflicted.

#### EFFECT OF THE GOVERNMENT DECREE AS TO THE LEASE-ONLY POLICY

Section 5(a) of the Clayton Act (15 U.S.C. § 16(a)) makes the Government decree "prima facie evidence" against United in the present action "as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto."

Here the Government decree expressly declared that United's leases with any one of four specified restrictive provisions—a term of ten years, a full capacity clause, deferred charges on return and non-segregation of repair and service charges—were means by which United had monopolized the shoe machinery industry. The decree does not contain any comparable declaration regarding United's failure to make shoe machinery available for sale. From this United argues that the Government decree is not prima facie evidence that its failure to offer shoe machinery for sale was illegal, since this is not a matter which was adjudicated in the Government case. For additional support it points to the fact that Paragraph 61 of

the Government's complaint expressly alleged that United had refused to sell machinery, and urges that this was one of the "other charges of violation of the Sherman Act set forth in the complaint" which Section 2 of the Government decree declared "are dismissed with prejudice." On the face of the decree, therefore, United's contention is not lacking in merit.

■ United supports its contention by the claim that the courts are limited to the Government decree itself in determining the existence and extent of an estoppel under § 5(a) unless it is necessary to go beyond it to resolve an ambiguity in the decree. Such a construction of § 5(a) would seriously weaken its underlying policy of lightening the burden on private antitrust plaintiffs, who play such an important role in the implementation of the antitrust laws.[8] It is in harmony with that policy to give prima facie effect to any fact which the findings or the opinion fairly show was actually adjudicated in the Government case.[9] To do otherwise would hamper on a technicality of form the policy of affording private antitrust litigants the fullest benefit of a successful Government suit. In Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568–569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951) the Supreme Court held that a criminal judgment was available to private litigants as prima facie evidence of "all matters of fact and law necessarily decided by the conviction and the verdict," since § 5(a) embodied a Congres-

---

7. It is unnecessary for us to consider whether the broad terms of the statute should be narrowed by construing § 4 to require that the injury be "direct," Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9 Cir. 1955), or whether a presumption of liability exists once injury has been shown, South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4 Cir. 1966); Note, Standing to Sue for Treble Damages under Section 4 of the Clayton Act, 64 Colum.L.Rev. 570, 586–88 (1964). See also Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

8. See, e. g., Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 751–752, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 567–568, 71 S.Ct. 408, 95 L.Ed. 534 (1951); Radovich v. National Football League, 352 U.S. 445, 453–454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318–319, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965).

9. Under Rule 52(a) findings of fact and conclusions of law need not be isolated under such specific designations if they appear generally in the opinion of the court.

sional policy "to confer, subject only to a defendant's enjoyment of its day in court against a new party, as large an advantage as the estoppel doctrine would afford had the Government brought suit." This goes further than the use of the determinations which appear in the findings and opinion of the judge sitting without a jury in a civil case.

United would distinguish *Emich* on the ground that it rested on a general verdict of guilty which does not specifically indicate the nature of the jury's findings and that the conclusion in that case therefore was a result of necessity. The absence of any factual finding in a criminal verdict is no reason for holding that findings by a judge without a jury in a civil case are to be ignored because his decree is more elaborate.

We turn then for illumination to the elaborate findings of fact and opinion of Judge Wyzanski which accompanied the decree. A separate heading entitled "Effects of the Leasing System" in the findings of fact describes the effect of United's leasing system as it worked in practice from the viewpoint of United, of shoe manufacturers and of potential and actual competitors of United. In dealing with the effect of United's leasing system on shoe manufacturers, there is a full appraisal of the advantages to the shoe manufacturer and note is made of the virtual absence of dissatisfaction with the system. Judge Wyzanski then went on to say: "However, while United's system has made it easier to enter the shoe manufacturing industry than to enter many, perhaps most, other manufacturing industries, it has not necessarily promoted in the shoe manufacturing field the goals of a competitive economy and an open society. Without attempting to make findings that are more precise than the evidence warrants, this much can be definitely stated." 110 F. Supp. at 323–324. There follow six consequences to shoe manufacturers if United's machinery were available for sale. Among these is the fact that shoe manufacturers who bought United's machines "would not be subject, as are those manufacturers who lease United machines, to the unilateral decision of United whether or not to continue or modify those informal policies which are not written in the leases and to which United is not expressly committed for any specific future period. * * * United's reserved power with respect to these matters gives it some greater degree of psychological, and some greater degree of economic control, than a seller of machinery would have." 110 F.Supp. at 324. In another category is this statement: "Some manufacturers who had bought machinery would find that financial and psychological considerations made them more willing than lessees would be, to dispose of already acquired United machines and to take on competitors' machines in their place." 110 F. Supp. at 324. These statements are reiterated in a form which shows that this effect was inherent in the lease-only system itself, and did not arise solely from the four restrictive features: "Yet as already noted, a shoe manufacturer may psychologically or economically be more impeded by a leasing than by a selling system. And this general observation is buttressed by a study of features in the United leasing system which have a special deterrent effect." 110 F.Supp. at 324.

Throughout his opinion Judge Wyzanski repeatedly stressed this distinction between the special obstacles to competition established by the four restrictive provisions in the United leases, and the general anti-competitive effects which flowed from the mere existence of a lease-only system. On the latter issue, he recognized the "magnetic ties inherent in [United's] * * * system of leasing, and not selling, its more important machines," and stressed that these ties, especially in the context of United's market control, fostered a sense of "partnership" among United and its customers which made it more difficult for another manufacturer of shoe machinery to take

away part of the United market.[10] Moreover, he declared that the end of the lease-only system would also increase competition by making available second-hand machines, which would promote a "substitute competition" and would make it possible for other manufacturers to study the United machines so as to experiment with alterations in them and to copy their unpatented features.[11] Finally, although he ordered United's leases to be purged of their restrictive provisions in the future, he also ordered United in Section 5 of the decree to offer for

10. "However, United's leases, in the context of the present shoe machinery market, have created barriers to the entry by competitors into the shoe machinery field.

"First, the complex of obligations and rights accruing under United's leasing system in operation deter a shoe manufacturer from disposing of a United machine and acquiring a competitor's machine. He is deterred more than if he owned that same United machine, or if he held it on a short lease carrying simple rental provisions and a reasonable charge for cancellation before the end of the term. The lessee is now held closely to United by the combined effect of the 10-year term, the requirement that if he has work available he must use the machine to full capacity, and by the return charge which can in practice, through the right of deduction fund, be reduced to insignificance if he keeps this and other United machines to the end of the periods for which he leased them." 110 F.Supp. at 340.

"In estimating defendant's strength, this Court gives some weight to the 75 plus percentage of the shoe machinery market which United serves. But the Court considers other factors as well. In the relatively static shoe machinery market where there are no sudden changes in the style of machines or in the volume of demand, United has a network of long-term, complicated leases with over 90% of the shoe factories. These leases assure closer and more frequent contacts between United and its customers than would exist if United were a seller and its customers were buyers. Beyond this general quality, these leases are so drawn and so applied as to strengthen United's power to exclude competitors." Id. at 343.

"But United's control does not rest solely on its original constitution, its ability, its research, or its economies of scale. There are other barriers to competition, and these barriers were erected by United's own business policies. Much of United's market power is traceable to the magnetic ties inherent in its system of leasing, and not selling, its more important machines. The lease-only system of distributing complicated machines has many 'partnership' aspects, and it has exclu-

sionary features such as hte 10-year term, the full capacity clause, the return charges, and the failure to segregate service charges from machine charges. Moreover, the leasing system has aided United in maintaining a pricing system which discriminates between machine types." Id. at 344.

"Furthermore, the creation of a sales market together with the purging of the restrictive features of the leases will, in combination, gradually diminish the magnetic hold now exercised by what United properly describes as the partnership features of the leasing system. As United's relationships with its customers grow feebler, competitors will have an enhanced opportunity to market their wares. * * *

"A further answer is that if the creation of a sales alternative to leasing is, as this Court believes, necessary to dissipate United's monopoly power, the Court should not withhold its decree because its effect is to allow competitors to copy United's designs." Id. at 350.

See Kaysen, United States v. United Shoe Machinery Corporation (1956), p. 275: "The most important single alteration in the operation of the shoe machinery market leading to an increase in the degree of competition therein is the end of the lease method of marketing, and the dissolution of the lease bundle which United provides under that method." See also pp. 193–194, 197–198, 276. Kaysen, an economist, acted as Judge Wyzanski's law clerk so that he could serve as an economic assistant on the United Shoe case. Kaysen's book is a reprint, with additional material, of the memorandum which he submitted to Judge Wyzanski after two years of research.

11. 110 F.Supp. at 344, 349–350. See also Kaysen, supra, at p. 73: " * * * the absence of a second-hand machinery market, which is a consequence of the leasing system, is a substantial support to United's market dominance and is probably second in importance in its effect on United's market power only to the duration of the lease and the circumstances surrounding terminations of leases among all the aspects of the leasing system which affect that power."

sale in the future any machine which it held out for lease. Judge Wyzanski thus justified this provision: "[United] has used its leases to monopolize the shoe machinery market. And if leasing continues without an alternative sales system, United will still be able to monopolize that market. To root out monopolization and to bring United, in the future, in the same class as its competitors, it is necessary not merely to place limitations upon United's leases, but also to require United to offer for sale any machine type which it leases. While, on its face, the decree seems to discriminate against United, in the context of the market situation created by United itself, the effect of the decree is to break down barriers erected by a monopolizer, so that, hereafter, there may be no wall between the class in which it is and the class in which its competitors are." [12] Rejecting the Government's suggestion that the decree require United to make its sales terms more attractive to customers than its lease terms, the opinion states: "[I]t seems to the Court sufficient to direct defendant, if it offers any machine type for lease, to set such terms for leasing that machine as do not make it substantially more advantageous for a shoe factory to lease rather than to buy a machine." 110 F.Supp. at 351.

■ All this, we believe, demonstrates that the lease-only system itself was adjudicated in the Government case to be a means of monopolization. Read in the light of the policy of making the Government's decree fully available to the private antitrust plaintiff, Hanover is entitled to the benefit of the determination and United is estopped from questioning it. See Emich Motors Corp. v. General Motors Corp., supra, 340 U.S. at 568, 71 S.Ct. 408, 95 L.Ed. 534.

### THE RETROSPECTIVE EFFECT OF THE GOVERNMENT DECREE

The court below concluded that the adjudged violations were illegal from their initiation decades earlier, but it limited damages to the period within the statute of limitations as suspended by various tolling provisions. See 245 F. Supp. at 294, n. 15.

The Government decree, entered in the District Court in Massachusetts on February 18, 1953 and affirmed by the Supreme Court on May 17, 1954, prohibited United after "A-Day," which turned out to be January 1, 1955, from offering machines for lease unless it also offered them for sale. United urges that the decree was meant to operate only prospectively. In support of this view it points to the absence of any specific declaration in the decree that the lease-only system violated the antitrust law and maintains that the exclusive purpose of the decree was to break up United's market power in the future.

■ What we have already said requires us to reject the contention that the Government decree has no retrospective effect. For the remedial character of an equity decree does not necessarily imply that the conduct which it prohibits in the future was valid in the past. Decrees such as the Government decree are aimed at redressing the effects of antitrust violations in the future, and acceptance of United's contention would subvert the purpose of § 5(a), for it would put an end to treble damage recovery by private parties in reliance on Government decrees, since they are prima facie evidence only in cases where the damage period is within the period covered by the Government case. International Shoe Machinery Corp. v. United Shoe Machinery Corp., 315 F.2d 449 (1 Cir. 1963), cert. denied, 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963); Dart Drug Corp. v. Parke, Davis & Co., 120 U.S.App.D.C. 79, 344 F.2d 173, 184–186 (1965).[13]

This leads us to the question of the extent of the retroactivity of the Government decree.

12. 110 F.Supp. at 350.

13. There is no dispute that United machines leased by Hanover were unavailable for sale to Hanover before June 1, 1955, the date on which Judge Wyzanski approved United's plan for terminating

Judge Wyzanski made vividly clear the extraordinary position of United in regard to the antitrust laws. Three times, in 1913, in 1918 and in 1922, United had been under the scrutiny of the Supreme Court. United States v. Winslow, 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481 (1913); United States v. United Shoe Machinery Co. of N. J., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968 (1918); United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922). In Judge Wyzanski's words: "What United is now doing is similar to what it was then doing, but the activities which were similar stood uncondemned,— indeed, one ought to go further and say they were in part endorsed." 110 F. Supp. at 348.[14] He held that the last two cases still had enough vitality to prevent his holding, as he otherwise would, that United had violated § 1 of the Sherman Act by its lease-only practice. "[T]his inferior court feels precluded," said Judge Wyzanski, "from so deciding because of the overhanging shadows of * * * the Sherman and Clayton Act cases involving this company's predecessor and itself. Though these cases may ultimately be overruled by the Supreme Court, they have not yet lost all authority." 110 F.Supp. at 343. Judge Wyzanski was of the view, however, that the interpretation of § 2 of the Sherman Act was significantly changed in 1946 when the Supreme Court in American Tobacco Co. v. United States, 328 U.S. 781, 811–815, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) expressly approved Judge Learned Hand's analysis in 1945 in the Alcoa case, United States v. Aluminum Co. of America, 148 F.2d 416 (2 Cir. 1945). Judge Wyzanski stressed the absence in United's conduct of predatory practices, which the decisions prior to Alcoa had emphasized as an element in monopolization.[15] He held that United's conduct now ran afoul, however, of § 2 under the Alcoa doctrine, which brought within its prohibition monopolization attained by conduct which although "honestly industrial" cannot be said to render market control, which is inherently evil, an economically inevitable result, for in such a case it cannot be said of a defendant that greatness was thrust upon him. 110 F.Supp. at 341–342. In so finding, however, Judge Wyzanski said: "It is only fair to add that the more than 14,000 page record, and the more than 5,000 exhibits, representing the diligent seven year search made by Government counsel aided by this Court's orders giving them full access to United's files during the last 40 years, show that United's power does not rest on predatory practices. Probably few monopolies could produce a record so free from any taint of that kind of wrongdoing." 110 F.Supp. at 345.

In these circumstances, we believe it was error to hold that United was liable in damages to Hanover for the period stretching back to the beginning of its conduct, despite the approval of its leasing policy in various forms by three successive decisions of the Supreme Court. The court below cut off damages prior to July 1, 1939 only because the statute of limitations barred such recovery. On the contrary, we think it erroneous to award damages for conduct manifestly pursued in the shelter of Supreme Court approval, at least until such time as subsequent decisions have clearly announced a change in the applicable law.

the leases. Moreover, the court below made specific findings as to the unavailability and unsuitability of other manufacturers' machines which were offered for sale for any part of the 1939–1955 period. In these circumstances, Hanover is not barred from damages occurring before June of 1951, the date of the close of evidence in the Government case (Compare International Shoe Machinery Corp. v. United Shoe Machinery Corp., supra), nor does United so argue.

14. This was so even though certain provisions of its leases, since terminated, had been held violative of § 3 of the Clayton Act in the third case, for United was specifically found free of the taint of predatory practices. 258 U.S. at 455, 42 S.Ct. 363.

15. See, e.g., United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920).

This conclusion follows from Judge Wyzanski's opinion and the modern view of the rights of parties who have relied upon authoritative statements of the law which are later changed.

Recent decisions of the Supreme Court in criminal cases have made it clear that the unrealistic theory that the law has always been what the latest case for the first time declares it to be, the so-called Blackstonian view, must yield to the practical realization that conduct had occurred in reliance on the earlier rules of law to the contrary.[16] In antitrust cases the question of retroactivity is still open.[17] We believe that retroactivity should be determined from the circumstances of the particular case, having in mind the purpose which the new rule of law seeks to accomplish and the practical weighing of the comparative benefits and evils of retroactivity. In civil cases, unlike criminal cases, it is appropriate to recognize that businessmen must rely upon counsel, who in turn are guided by the existing precedents in making difficult decisions on the effect of the antitrust laws on specific business conduct. In suits for damages in such cases it is particularly appropriate to be mindful of the injustice of retroactive imposition of the penalty of treble damages. In the present case the penalty of treble

damages is enough, in conjunction with the absence of predatory practices and the survival of United's leasing policy under the Sherman Act after three passages through the Supreme Court, to require that United should not be held to have violated the antitrust laws before the change occurred in the law which for the first time made its conduct unlawful.

The remnant of the problem which remains is whether the appropriate date which marks the commencement of liability should be the date of the *American Tobacco* decision of June 10, 1946 or the *Alcoa* decision of March 12, 1945. The high authority of Judge Hand's opinions and the unusual circumstances in which *Alcoa* came to be decided give the case a place of preeminence in the history of antitrust law. We do not believe, however, that another business which had three times in various forms been adjudged free from violation of the Sherman Act was required to abandon its well known form of operation before Judge Hand's view in *Alcoa* received the imprimatur of the Supreme Court, however inevitable it may now seem in retrospect. At the time it was well known that Alcoa could not be passed on by the Supreme Court,[18] and whether it would agree with Judge Hand's opinion could only be made known in another case, as

16. Thus, e. g., retroactivity was refused to be accorded in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), dealing with exclusion of illegally seized evidence; in Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L. Ed.2d 453 (1966), to Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), dealing with comment on the failure of a defendant in a state criminal trial to take the stand; in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), to Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. State of Ariz., 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), dealing with custodial police questioning of criminal suspects. See also Butcher v. City of Philadelphia, 380 Pa. 290, 110 A. 2d 349 (1955).

17. Simpson v. Union Oil Co., 377 U.S. 13, 24–25, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); see also Lyons v. Westinghouse Electric Corp., 235 F.Supp. 526, 536–37 (S.D.N.Y.1964).

18. The decision in *Alcoa* by the Circuit Court of Appeals for the Second Circuit was final because of the unique circumstances which surrounded the case. The district court had dismissed the complaint, United States v. Aluminum Co. of America, 44 F.Supp. 97 (S.D.N.Y.1941), and on a direct appeal the Supreme Court was without a quorum due to the disqualification of four Justices. The Court therefore transferred the case to a special docket and postponed further proceedings in the appeal until such time as there was a quorum of Justices qualified to sit in the case. 320 U.S. 708, 64 S.Ct. 73, 88 L.Ed. 415 (1943). Congress thereafter amended 15 U.S.C. § 29 by the Act of June 9, 1944, ch. 239, 58 Stat. 272, which

it was a year later in *American Tobacco* on June 10, 1946.

We conclude, therefore, that United's conduct cannot be held to have violated § 2 of the Sherman Act at any time prior to June 10, 1946. We believe this is the effect to be given to the Government decree. The damages recoverable by Hanover therefore may not reach any earlier period.

### CERTIFICATION

■■■ United urges that the court below should have certified to the District Court in Massachusetts the questions dealing with the interpretation and effect of that court's decree. The obvious economy in judicial effort which would follow from such a practice, especially in a case as protracted as the Government suit against United, speaks strongly in its favor. On the other hand, there is much to be said for a litigant's right to the judgment of the court which he invokes and for the view that the scope of the conclusions and decrees of sister federal courts, however complicated may be the litigation out of which they arose, may well be determined by an objective evaluation of what has been recorded in opinion and decree rather than by a subjective interpretation which may include in retrospect what was locked in the breast of the original judge.

In the circumstances which prevail in this case, however, we need not determine this interesting question.[19] United did not apply for certification of the questions relating to the meaning and effect of the Government decree during the lengthy trial in the court below. It

did not even do so immediately after the opinion was filed in the district court on April 28, 1965. Instead, on May 21, 1965, United applied to Judge Wyzanski in the District Court in Massachusetts on notice to Hanover and the Government for construction or amendment of the Government decree. At a hearing on May 28, 1965 Judge Wyzanski declined to act on the ground of comity in view of the late stage of the case in the Middle District of Pennsylvania.

United contends with much force that Judge Wyzanski plainly indicated at the hearing his informal interpretation of the decree contrary to that of the court below. But whatever the parties may make of Judge Wyzanski's comments from the bench at that time, it was not until after the application was denied on May 28, 1965 that United, on June 9, 1965 in connection with its motion for a partial new trial applied for a certification by the court below to the District Court in Massachusetts of the questions relating to the effect of the Government decree.

We hold that in view of the untimeliness of the request for certification, its denial by the court below was not an abuse of discretion.

### STATUTE OF LIMITATIONS

The suit was filed before the effective date of the amendment of July 7, 1955 creating a federal four year statute of limitations in antitrust actions (15 U.S.C. § 15b). The parties are agreed that by virtue of the applicable Pennsylvania statute and various tolling provi-

---

provided that in such circumstances the Court should certify the case to the appropriate circuit court of appeals, in lieu of a decision by the Supreme Court, and the decision of the circuit court of appeals should be final and unreviewable. Acting under the statute the Supreme Court certified the case to the Circuit Court of Appeals for the Second Circuit and it was in what Mr. Justice Frankfurter concurring in United States v. United States District Court for the Southern District of New York, 334 U.S. 258, 265, 68 S.Ct. 1035, 1038, 92 L.Ed. 1351 (1948)

called "an extraordinarily rare, if not unique, situation in the history of the Court," that Judge Learned Hand's decision came to be written in Alcoa. See also American Tobacco Co. v. United States, 328 U.S. 781, 811–812, 66 S.Ct. 1125 (1946).

19. See United States Gypsum Co. v. National Gypsum Co., 352 U.S 457, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957); see also Levin, Inter-Jurisdictional Certification: Beyond Abstention Toward Cooperative Judicial Federalism, 111 U.Pa.L.Rev. 344 (1963).

sions[20] the six-year period under the statute was extended backward so as to bar claims for conduct prior to July 1, 1939.

The contention now made, however, is that if there was a refusal by United to sell shoe machinery to Hanover, the injury occurred many years prior to 1939, in fact perhaps even before the present century, and hence all recovery is barred by the statute of limitations. This contention falls in view of our holding that the duty to sell established by the Government decree did not come into existence until 1946. Since the injury could not have occurred prior to 1946, Hanover's claim is well within the period of the statute of limitations.

### DAMAGES

1. *The Damages Within the Allowable Period.*

The court below held that as a result of United's unlawful monopolization Hanover was required to pay more on the leases for the use of its shoe machinery than it would have been required to pay if the machinery had been available for sale in a free and competitive market. It held that as a result Hanover was damaged in the period from July 1, 1939 through September 21, 1955 in the amount of $1,413,203, which when trebled amounted to $4,239,609.

■ The damage period, as we have already seen, must be limited to commence on June 10, 1946. In the present state of the record it is not clear that the court below was justified in fixing the end of the damage period at the date of the institution of the action. Section 9 of the Government decree required United to present to the court before "B Day" a detailed plan for terminating all outstanding leases and for converting the lessees' rights to ownership of the machines they then held. The plan was approved by Judge Wyzanski on June 1, 1955. The record shows that Hanover actually converted to ownership its previously leased machines sometime in October, 1955.

In these circumstances, the damage period ended on June 1, 1955 for on that date the conversion from leasehold to ownership was available to Hanover and the unlawful lease-only policy had ended.

Accordingly, no damages may be allowed for the period between June 1, and September 21, 1955,[21] or, as we have already determined, for the period prior to June 10, 1946. Since there is no division in the record of the damages for either of these two periods, it will be necessary to award a new trial on the issue of damages so that the proof may be broken down to show what damages, if any, were sustained during the allowable period.

A number of problems in the proof of damages which have been presented to us will recur on retrial. To the extent that it is possible to adjudicate them on the present record, it is desirable that we do so as a guide to the court below on the retrial.

2. *Cost of Capital.*

■ United contends that Hanover's so-called cost of capital should have been treated as an element of the cost of acquiring the machinery. The court below disallowed this item, which was defined as "the rate of return expected by investors on capital funds they place at * * [a concern's] disposal," after hearing the conflicting testimony of expert economists called by each party. It found that "cost of capital" is an economic concept which allows a company to decide if a certain investment is sound by computing the rate of return which will be required on that investment to justify expending funds on it rather than in an alternative investment, and that it is measured in terms of percentage of earnings per share of common stock to price per share, and of percentage of net profits after taxes to stockholders' equity. It also found that the measurement of cost of capital was vague and not susceptible of general agreement in its application and that in

---

20. See 245 F.Supp. at 294, n. 15.

21. Of course, the credit for salvage value should be computed as of that date.

any event it was not a proper element in the calculation of damages but was only a guide to investment.

The novel concept which United sought to have approved has not yet reached the point of general acceptance even among economists. We agree with the court below that cost of capital is not sufficiently related to actual costs to be included in an antitrust damage calculation.

### 3. *Tax Benefits.*

■ The court below held that whatever tax advantages Hanover obtained by the leasing system could not be considered in reduction of the amount of Hanover's recovery. It did so on the grounds that generally in tort and breach of contract actions taxes are not considered in assessing damages [22] and that any recovery by Hanover would be subject to taxation. It relied upon Judge Goodrich's statement in the passing-on trial that whatever happens after the injury which permits an injured plaintiff to escape some of the consequences of the wrong done him does not inure to the benefit of the defendant.[23] It therefore held that tax consequences to Hanover such as deductions for rents and royalties of leased machines and capital gains treatment for machines if owned and later sold were extraneous and were not to be considered.

In this we think the court below erred. What is involved here is not the tax on Hanover's recovery but rather the tax elements which would bear on Hanover's choice of purchasing rather than leasing the machinery it required. In making such a determination a business of any size necessarily must give consideration to the tax elements inherent in the two alternatives from which the choice must be made. It therefore was significant in determining whether Hanover, if it had been able to do so, would have purchased the machinery which it leased from United, to evaluate the respective tax consequences of purchase and of lease and their financial impact. Since these tax consequences are so inherently a part of the choice which would be made and since the court below has found that Hanover would have chosen to buy rather than lease the machinery, the award of damages should not exceed the difference between the two alternatives as Hanover itself would have computed it. The excess of one over the other of the two alternatives of purchase or lease should not be artificially inflated by ignoring the impact of taxation. We deal here not with subsequent tax effect on damages inflicted, but rather with damages resulting from the choice of one over another course of action in both of which the tax impact necessarily was a matter of contemporaneous consideration and significance. This is as realistic an element as the deduction which the court below required in order to reflect the fact that United serviced its machines as lessor, a duty which Hanover itself would have had to assume and pay for if it had been the owner of the machines.[24] In the same way, if Hanover had owned rather than leased the machines it would not have had the benefit of tax deductions for the rental and royalty payments to United and would have been subject to capital gains tax on the sale of any machines it sold at more than depreciated book value. It would be a distortion of reality to permit Hanover to recover damages on the ground that it would have bought machinery if it had been allowed to do so, without requiring it to give credit in its calculation of its damages for the savings which accrued to it from the tax advantages it received under the leasing system it now disowns and without also requiring it to reflect in its costs of ownership the taxes which such dominion would have imposed.

Hanover's damages therefore must be diminished by permitting United to show the favorable tax consequences which

---

22. Citing annotations in 63 A.L.R.2d 1393 and 1433.

23. 185 F.Supp. at 829.

24. See 245 F.Supp. at 287.

Hanover obtained from leasing and the unfavorable consequences which would have flowed from ownership of the machinery. We do no more than require accuracy in the calculation of the relative financial cost of leasing compared to buying the machinery, which must include those elements which a business corporation would necessarily consider in choosing between the two alternatives.

### HANOVER'S CROSS-APPEAL

Hanover in its cross-appeal attacks the district court's exclusion from its recoverable damages of those damages attributable to the unavailability of the United Goodyear Outsole Rapid Lockstitch Machine ("ORL") for the period 1939–1955, which it claimed amounted to $324,356.[25]

The court below excluded the item on the ground that another manufacturer's equipment, known as the Landis Stitcher, was available to Hanover and would have been satisfactory for its operations.[26] Hanover maintains that there is no evidence to support the conclusion that the Landis Stitcher was a satisfactory substitute for the ORL. It therefore seeks to have its damage judgment increased by threefold the amount of $324,356.

Even if Hanover's contention is correct, the present record does not permit an award of damages for this item. For the amount of $324,356 stretches over the period from 1939 to 1955 and we cannot allocate it within the allowable period beginning June 10, 1946 and ending June 1, 1955. This issue therefore must be remitted to the court below for reconsideration as part of the retrial on damages. When evidence has been taken on this question on retrial the record may well be different from what is now before us. In these circumstances, therefore, we shall not pass on the sufficiency of the present record to justify the conclusion that the Landis Stitcher could be used satisfactorily in Hanover's welt shoe manufacturing as a substitute for the ORL machine.

### COUNSEL FEES

The court below allowed to Hanover an attorneys' fee of $600,000 for the services of New York counsel and $50,000 for the services of Pennsylvania counsel. United objects that the allowances are excessive.

The district court tested the reasonableness of the fees, especially to New York counsel, not only by the hours devoted to the case, but also by the percentage of the recovery in its original and trebled amounts. See 245 F.Supp. at 303–304. Since the period for which damages may be awarded is now being reduced and a retrial will be held on damages, it will be for the court below to determine the reasonable fees which should be made to counsel in the light of whatever new award it may make on damages.

We will therefore vacate the award of counsel fees and order counsel fees to be redetermined in the light of whatever damages the court may find on the rehearing.

### CONCLUSION

In United's appeal (Appeal No. 15626) the judgment of the court below will be vacated as to damages and a new trial will be awarded limited to damages, in accordance with this opinion; and the award of counsel fees in the amount of $600,000 for the services of Donovan, Leisure, Newton & Irvine and $50,000 for the services of Nogi, O'Malley & Harris will be vacated for further proceedings in accordance with this opinion.

In Hanover's appeal (Appeal No. 15627) the judgment will be vacated so that the issue therein raised may be reconsidered as part of the retrial of damages.

## SUPPLEMENTAL OPINION

FREEDMAN, Circuit Judge:

Only one argument made in the petitions for rehearing calls for further com-

---

**25.** See 245 F.Supp. at 299, 302.

**26.** 245 F.Supp. at 283.

ment. United argues in its petition, as it did before us, that the statute of limitations completely bars Hanover's claim for damages. Both parties had conceded at trial that the applicable six-year Pennsylvania statute of limitations had been extended backward by various tolling provisions to allow recovery of all damages incurred after 1939. We reduced the period of allowable damages to one beginning in 1946, when the *American Tobacco* case was decided, and we did not reach United's contention regarding the statute of limitations, because we reasoned that since United's conduct did not become illegal until 1946, Hanover's cause of action for damages could not have arisen any earlier.

United now argues that the statute of limitations began to run in 1912 or even earlier, when it first refused to sell its machinery, and that the statute was not tolled simply because the conduct which caused the injury was legal under the precedents of that time.[1] This, however, does not require a different result in this case, for United has misconceived the basic nature of Hanover's claim for damages.

United argues that where a refusal to deal causing damages has occurred well before the allowable period under the statute of limitations, no recovery may be had, even for damages following the reiteration of such a refusal to deal within the statutory period.[2] The cases relied on, however, are very different from the present case. First, they are antitrust conspiracy cases in which the plaintiff sought to recover damages for the full period both within and outside the statute of limitations, on the claim that the statute did not begin to run until the termination of the conspiracy. Here, however, Hanover does not seek to recover the damages it suffered before 1939; it concedes that any claims it had for conduct in that period are now barred and seeks only to recover for damages inflicted after 1939. Secondly, on the facts in the cases cited by United it would have been difficult to segregate damages which flowed from the original refusal to deal from damages attributable to the continued refusals within the statutory period. On the other hand, the specific collection of rentals every month within the statutory period provides a concrete standard for the measurement of the damages which occurred here within the statutory period by comparing the rentals with the reasonable sales value of the machinery.[3] Finally, in the cited cases the continuing conduct was that of a mere re-assertion of the refusal to deal. Here, however, United went beyond a mere continuation of the refusal to sell; it collected rentals on leases and entered into new leases when old machinery was no longer in working condition and required replacement.

1. For this United cites Marrero Morales v. Bull Steamship Co., 279 F.2d 299 (1 Cir. 1960); Versluis v. Town of Haskell, 154 F.2d 935 (10 Cir. 1946).

2. For this United cites Garelick v. Goerlich's, Inc., 323 F.2d 854 (6 Cir. 1963); Peto v. Madison Square Garden Corp., 1965 Trade Cases ¶ 71, 398 (S.D.N.Y. 1965); Sherman v. Goerlich's, Inc., 238 F.Supp. 728 (E.D.Mich.1963), aff'd, 341 F.2d 988 (6 Cir. 1965), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965); Norman Tobacco & Candy Co., Inc. v. Gillette Safety Razor Co., 197 F.Supp. 333 (N.D.Ala.1960), aff'd, 295 F.2d 362 (5 Cir. 1961); Emich Motors Corp. v. General Motors Corp., 1955 Trade Cases ¶ 67,960 (N.D.Ill.1955), aff'd, 229 F.2d 714 (7 Cir. 1966). See, also Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9 Cir. 1956); Campbell Distributing Co. v. Jos. Schlitz Brewing Co., 208 F.Supp. 523 (D.Md.1962); Gaetzi v. Carling Brewing Co., 205 F.Supp. 615 (E.D.Mich.1962); Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc., 153 F. Supp. 589 (D.N.J.1957), aff'd, 307 F.2d 210 (3 Cir. 1962), cert. denied, 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1963).

3. The Muskin Shoe Co. v. United Shoe Machinery Corp., 167 F.Supp. 106 (D. Md.1958), which found a similar measure too complex, was specifically rejected by Chief Judge Sheridan, and we agree that it should not be followed. See 245 F.Supp. at 295–296.

The rule applicable to the facts in this case is that where the repeated and measurable invasion of a plaintiff's rights occurs both outside the statutory period and also within it, the fact that some of the injury and damage occurred outside the statutory period does not affect the plaintiff's right to recover for the separate invasion of its rights which occurred within the period.[4] Indeed, any other rule would be an affront to reason, for it would require the conclusion that injury and damages which were inflicted, as in this case, in 1955, by concrete and specific business transactions, were barred by the statute of limitations as long ago as 1918 or even earlier, because of similar but not identical conduct. The policy of the statute of limitations is maintained by allowing recovery for measurable injury within the period and barring recovery for injury beyond it. The operative facts underlying Hanover's claim occurred within the statutory period as tolled, and the traditional concern regarding lost witnesses and fading memories is thus fully satisfied. Moreover, we effectuate the general policy against stale claims in barring injury suffered before 1946. In so doing, however, we see no need to wipe out Hanover's current claim.[5]

ON PETITIONS FOR REHEARING.

Before STALEY, Chief Judge, and McLAUGHLIN, KALODNER, HASTIE, FORMAN, GANEY, SMITH, FREEDMAN, and SEITZ, Circuit Judges.

OPINION OF THE COURT

PER CURIAM:

The petitions for rehearing are denied.

4. Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725 (8 Cir. 1964); Roosevelt Raceway, Inc. v. Universal Controls, Inc., 1965 Trade Cases ¶ 71,565 (E.D.N.Y.1965); Susser v. Carvel Corp., 206 F.Supp. 636 (S.D.N.Y.1962), aff'd, 332 F.2d 505 (2 Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); Cardinal Films, Inc. v. Republic Pictures Corp., 148 F. Supp. 156 (S.D.N.Y.1957).

5. See Daniels v. The Beryllium Corp., 227 F.Supp. 591 (E.D.Pa.1964) and 211 F. Supp. 452 (E.D.Pa.1962), where recovery was permitted for the aggravation of an illness during the statutory period, although relief for the original injury was held barred by the statute of limitations.